# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| THE SIDING AND INSULATION CO., | ) | CASE NO. 1:11-cv-1060 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| ALCO VENDING, INC., | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Arising under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)(1)(C), this junk fax case is before the Court on two motions: (1) the second motion of plaintiff Siding and Insulation Co. ("plaintiff" or "Siding") for class certification (Doc. No. 113 ["Mot. Class"]), and (2) the second motion of defendant Alco Vending, Inc. ("defendant" or "Alco") for summary judgment. (Doc. No. 120 ["MSJ"].) Defendant opposes plaintiff's request for class certification (Doc. No. 118 ["Mot. Class Opp'n"]), and plaintiff has filed a reply. (Doc. No. 121 ["Mot. Class Reply"].) Plaintiff, in turn, opposes defendant's summary judgment motion (Doc. No. 124 ["MSJ Opp'n"]), and defendant has replied. (Doc. No. 125 ["MSJ Reply"].) On June 23, 2017, the Court held a hearing on these motions.[1] For the reasons that follow, defendant's second summary judgment motion and plaintiff's second motion to certify the class are both denied.

---

[1] At the conclusion of the hearing, the Court took the matters under advisement and permitted the parties to file supplemental briefs (Doc. No. 129 ["P. Suppl."]); Doc. No. 130 ["D. Suppl."]) and supplemental response briefs (Doc. No. 131 ["D. Suppl. Resp."]; Doc. No. 132 ["P. Suppl. Resp."]) on the issue of the statute of limitations relative to plaintiff's request for certification of the proposed class.

## I. BACKGROUND

This case is one of a string of lawsuits filed in connection with the activities of a company known as Business to Business Solutions ("B2B"), an entity run by Caroline Abraham out of her home in New York and in concert with a Romanian company known as Macaw (where appropriate, collectively referred to as "B2B/Macaw"), which sold fax advertising services to companies in the United States. "B2B purchased a list of fax numbers from a company called InfoUSA, Inc. For a fee, B2B faxed clients' advertisements to hundreds of numbers from that list, a practice known as 'fax-blasting.'" *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1122 (6th Cir. 2016) (quotation marks and internal citations omitted). To date, the activities of B2B and Macaw have sparked over 100 lawsuits.[2] *Compressor Eng'g Corp. v. Thomas*, 319 F.R.D. 511, 517 (E.D. Mich. 2016) (quotation marks and citation omitted).

Alco, the defendant is this particular case, is in the business of placing and stocking vending machines for its customers. (Doc. No. 120-1 (2010 Deposition of Richard Gajdos ["Gajdos Dep. I"]) at 7-8[3].) At all times relevant to the present litigation, Richard Gajdos was the president of Alco and owned 100% of its stock. (*Id.* at 7, 11.) Sometime in 2005, Gajdos

---

[2] A number of decisions have recounted the sordid details surrounding the allegedly fraudulent activities of these two companies. *See, e.g., id.* at 516-17 (citation omitted); *Avio, Inc. v. Alfoccino, Inc.*, 311 F.R.D. 434, 437-38 (E.D. Mich. 2015) (quoting *APB, Inc. v. Bronco's Saloon, Inc.*, 297 F.R.D. 302, 304-06 (E.D. Mich. 2013)); *see also Bridging Communities.*, 843 F.3d at 1122. This Court will not re-trod over such well-traveled ground, other than to comment that, in light of her fax-blasting activities, prior courts have referred to Abraham as "a modern-day 'typhoid mary[.]'" *Bridging Communities*, 843 F.3d at 1122 (quoting *Avio*, 311 F.R.D. at 434) (further quotation marks and citation omitted).

[3] All page number references to depositions are to the page numbers generated by the transcribing court reporter. All other page number references are to the page identification number generated by the Court's electronic docketing system.

received one or more unsolicited faxes from B2B offering to send faxes on behalf of Alco advertising its vending machine services. (Gajdos Dep. 1 at 19-20; Doc. No. 120-2 (2016 Deposition of Richard Gajdos ["Gajdos Dep. II"]) at 9-10, 21.) Gajdos contacted B2B and spoke with someone who referred to himself as Kevin Wilson.[4] Wilson explained that B2B had a list of businesses in Alco's area (and with the same area code) that would receive the fax advertisements. He represented that B2B could send faxes to these business "with no problem to" Gajdos. (Gajdos Dep. II at 10, 13.) Wilson sent Gajdos several sample advertisements. Gajdos settled on one particular advertisement, after offering his input on certain content details. (*Id*. at 10-11, 18-19; Gajdos Dep. I at 22.)

During the course of their negotiations, Wilson made several representations to Gajdos regarding the nature of the advertising services offered by B2B. He assured Gajdos that B2B already had communicated with the businesses on the recipient list, and that B2B had a right to send them a fax because it "had a business relationship with them." (Gajdos Dep. I at 23-24; *see* Gajdos Dep. II at 24.) Wilson also volunteered that the faxes were "100 percent legal," reiterating that B2B "had a full and open relationship with" each of the proposed recipients. (Gajdos Dep. I at 25-26; Gajdos Dep. II at 13, 20-21.)[5] B2B/Macaw controlled the list of recipients, though Gajdos admitted that he never asked to see the list and believed it did not contain any of Alco's clients. (Gajdos Dep. I at 23-24; Gajdos Dep. II at 24-25, 44-45; Doc. No. 120-6 (Deposition of Caroline Abraham ["Abraham Dep."]) at 95-97, 100-01.)

---

[4] It is undisputed that "Kevin Wilson" was an alias.

[5] Gajdos testified that, prior to Wilson's representation that the faxes were "100 percent legal," he had no concerns regarding the legality of the proposed advertisement. He explained "I received faxes on my fax machine every day from everybody, so I didn't think there was anything wrong with it. And then [Wilson] offered that, that it was 100 percent legal because they were sending it to all of their clients, so I said, Okay, fine." (Gajdos Dep. II at 21.)

Gajdos ultimately authorized B2B to transmit the advertisement and paid for this service by faxing a check for $188 to B2B. (Gajdos Dep. I at 11.) Following payment, the initial round of faxes was sent in November 2005 by Macaw working with B2B.

After this first wave of faxes went out, Gajdos received "a couple" of complaints from attorneys representing recipients who did not consent to receiving the faxes. Some of the attorney letters threatened litigation. Gajdos did not read the letters or complaints, but directed his staff to "refer the complaint[s] right to Mr. Wilson . . . it was [B2B's] job[.]" (Gajdos Dep. II at 48.) For his part, Wilson assured Gajdos "he would have [the complaining businesses] taken off the list. He said he would take care of it." (Gajdos Dep. at 32, 56.) Gajdos ultimately authorized and paid B2B to send a second wave of fax advertisements that were transmitted in July 2006. Between the two attempts, Macaw successfully sent 7,055 transmissions to 4,547 unique fax numbers. (Doc. No. 113-4 (Expert Report of Robert Biggerstaff ["Biggerstaff Ex. Rpt."]) ¶ 21.)

Plaintiff was one of the businesses to receive one or more of the faxes sent by B2B/Macaw advertising the services of Alco. On May 24, 2011, plaintiff brought the present action alleging that, by authorizing the faxes, Alco violated the TCPA inasmuch as plaintiff did not invite or give permission to Alco to send the faxes. (Doc. No. 1 (Complaint ["Compl."]) ¶ 13.) Plaintiff moved for certification of the class of all those who received the allegedly offending faxes, and defendant moved for summary judgment. The motions were referred to the magistrate judge who issued a report and recommendation that summary judgment be granted to defendant and the class certification motion be denied as moot. The Court adopted the R&R and dismissed the action.

On appeal, the Sixth Circuit reversed. In so ruling, the court found that the magistrate judge and the district court had applied the wrong standard when evaluating Alco's conduct under the TCPA. Because the faxes were sent between November 2005 and July 2006, the court determined that the "on-whose-behalf" standard governed. *Siding & Insulation Co. v. Alco Vending, Inc*., 822 F.3d 886, 898 (6th Cir. 2016). The court explained that, pursuant to this standard, a plaintiff alleging a violation of the TCPA, 47 U.S.C. § 227(b)(1)(C), "must do more than simply show that the defendant's goods or services were advertised in the offending fax, but need not establish a complete agency relationship between the defendant and the fax broadcaster." *Id*. (citing *Cin-Q Auto., Inc. v. Buccaneers Ltd. P'ship*, No. 8:13-cv-01592-AEP, 2014 WL 7224943, at *1 (M.D. Fla. Dec. 17, 2014) (explaining that the standard is "more forgiving than a blanket application of *per se* liability but somewhat more stringent than vicarious liability through common law agency[]")).

The Sixth Circuit further identified a number of factors that guide a court's consideration of whether a fax broadcaster had sent the transmission "on behalf of" another entity. *Id*. at 898-99. Applying these factors to the record in this case, the court observed that some of the factors indicate that "B2B did not act on Alco's behalf[,]" while others "tend to support the conclusion that B2B did in fact act on Alco's behalf." *Id*. at 899-901. The court remanded the matter to the district court "to apply the correct legal standard." *Id*. at 901. The Sixth Circuit noted that, on remand, the district court could allow further discovery and permit any such "further proceedings as it determines is [sic] necessary to effectuate the standard described above." *Id*. It also directed the district court to "reconsider whether, after conducting such proceedings, Siding's motion for class certification remains moot." *Id*.

The case was reassigned to the undersigned pursuant to General Order 2015-12, due to the original judge's retirement. At the request of counsel, the Court permitted the parties to conduct limited discovery before re-briefing plaintiff's request for class certification. (Minutes, dated 6/28/16.) Following this period of discovery, the parties filed the previously mentioned pending motions.

## II. Defendant's Second Summary Judgment Motion

### A.   Standard of Review

Under Fed. R. Civ. P. 56(a), when a motion for summary judgment is properly made and supported, it shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

An opposing party may not rely on allegations or denials in its own pleading; rather, by affidavits or by materials in the record, the opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1). Affidavits or declarations filed in support of or in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In reviewing summary judgment motions, the Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact

exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict[.]" *Id.* at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established that create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992) (citation omitted). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.* (citation omitted).

**B.     Governing Law Under the TCPA**

The TCPA makes it unlawful "to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless certain facts exist. TCPA, 47 U.S.C. § 227(b)(1)(C).[6] An unsolicited advertisement is defined in the TCPA as "'any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise.'" *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 212 F. Supp. 3d 1286, 1291 (S.D. Fla. 2016) (quoting 47 U.S.C. § 227(a)(5)). However, the TCPA is silent as to who qualifies as a "sender" of junk faxes. Recognizing this ambiguity, the Federal Communications Commission ("FCC") issued an order in 1995, clarifying that "the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements[.]" *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12407 (1995).

As the Sixth Circuit explained in its decision remanding the present case, "[t]o decide whether one entity (such as B2B in this case) broadcast a potentially unauthorized fax 'on behalf of' another entity (such as Alco in this case), courts have considered a variety of factors. These factors include the degree of control that the latter entity exercised over the preparation of the faxes, whether the latter entity approved the final content of the faxes as broadcast, and the nature and terms of the contractual relationship between the fax broadcaster and the latter

---

[6] The statute provides a private right of action for injunctive relief and for damages equal to the actual monetary loss or $500 for each violation. § 227(b)(3). The amount of the award may be tripled if the Court finds that the violation was willful or knowing. *Id.*

entity." *Siding*, 822 F.3d at 898-99 (citation omitted). The court went on to note that "[o]ne court has summarized the 'on-whose-behalf' inquiry as follows:

> Circumstances to be considered include, but are not limited to, the degree of input and control over the content of the fax(ex), the actual content of the fax(es), contractual or expressly stated limitations and scope of control between the parties, privity of the parties involved, approval of the final draft of the fax(es) and its transmission(s), method and structure of payment, overall awareness of the circumstances (including access to and control over facsimile lists and transmission information), and the existence of measures taken to ensure compliance and/or to cure non-compliance with the TCPA.

*Id*. at 899 (quoting *Cin-Q Auto*, 2014 WL 7224943, at *7).[7] The Sixth Circuit explained that courts applying the "on-whose-behalf" standard do not apply it "with a layperson's understanding of what that phrase might mean; instead, they treat the phrase 'on whose behalf' as a term of art that should be interpreted in a way that seeks to hold liable the entity ultimately at fault in causing a TCPA violation." *Id.*

As set forth above, employing the factors identified in its decision of remand, the Sixth Circuit noted that several factors favored a finding that the faxes were not set on behalf of Alco. Specifically, the court found that the factors favoring a finding that B2B did not act on behalf of Alco included that Gajdos had no or limited access to and control over the fax list; that when Gajdos received complaints he contacted Wilson who promised to take care of it; assurances made by B2B to Gajdos that B2B had a full and open relationship with each entity on the list; that a "factfinder could conclude that Alco reasonably relied on these representations in deciding

---

[7] *Cin-Q Auto* made clear that the inquiry requires a "totality" review of the relevant factors. *Cin-Q Auto*, 2014 WL 7224943, at *7 (citation omitted); *see, e.g., Sarris*, 212 F. Supp. 3d at 1299 ("The appropriate standard for determining whether a fax was sent on a defendant's behalf 'requires a totality-of-circumstances review, which incorporates the *Sarris* factors'").

to enter an advertising arrangement with B2B that Alco believed would not violate the TCPA or any other laws[]"; and that the faxes themselves indicated that the message was the property and sole responsibility of B2B. *Siding*, 822 F.3d at 900. The court noted that these last representations "could be viewed by a factfinder as tending to show that Alco lacked any significant input and control over the content of the fax(es)[.]" *Id.* (citation omitted).

Of course, the Sixth Circuit also found that some factors tended to favor a finding that B2B did act on behalf of Alco. The court highlighted the fact that Gajdos admitted Alco obtained clients as a result of the faxes, though the court warned that Gajdos' admission, as a lay person, was not an endorsement that the "on-whose-behalf" standard had been met. The court also found significant the fact that Gajdos provided B2B information about Alco to craft the ad, showing some control. Additionally, the court observed that the faxes clearly promoted Alco's services. *Id.* at 900-01.

Finally, the Sixth Circuit instructed that on remand the district court and/or the jury "may take into account the reasonableness of Alco's reliance on B2B's representations that B2B would be solely responsible for the contents of the advertisements and that the faxes would be sent only to businesses that had previously consented to receive fax advertisements from B2B. . . . Alco's efforts to determine whether it was dealing with a reputable company or with a fly-by-night outfit is therefore a relevant factor for the court or a jury to consider." *Id.* at 901.

## C. Discussion

Alco, recognizing that the Sixth Circuit underscored the fact that the term "on whose behalf" is a term of art designed to impose liability on the entity responsible for the TCPA violation, argues that "[a]s between B2B/Macaw and Alco, there is no contest: B2B/Macaw is

the source and the party at fault for this violation." (MSJ at 4133.) However, the standard does not seek to identify the guiltier party. Under the TCPA, "the sender and fax broadcaster may be held jointly and severally liable[.]" *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991 (Junk Fax Prevention Act of 2005)*, 21 FCC Rcd. 3787, 3808 (2006). In fact, under the TCPA, it is the advertiser who is presumptively liable, and the broadcaster is only jointly liable where it has a "high degree of involvement" in the unlawful activity. *Id.* While the Court certainly considers B2B/Macaw's role in the alleged violations, it must determine whether Alco is liable regardless of whether B2B/Macaw is too.

On that note, Alco posits that it was fraudulently induced by B2B/Macaw to purchase their fax advertising services, and that B2B/Macaw made an "independent decision" to send the faxes to entities that it knew had never provided consent to receive such transmissions. (MSJ at 4120.) According to Alco, this action renders B2B/Macaw "'ultimately responsible' for the violations of the [TCPA]" alleged by plaintiff. (*Id.*) Applying the factors identified in cases like *Cin-Q Auto* and the Sixth Circuit's decision in this case, defendant insists that it is entitled to judgment as a matter of law.

The focal point of Alco's motion is its repeated representation that Wilson promised that B2B/Macaw would only send faxes to entities that had consented to receive them. (MSJ at 4122 ["B2B/Macaw repeatedly provided Alco with written assurance it would only send faxes to persons who had consented."]; *id.* at 4132 ["B2B/Macaw promised to provide Alco with the legal service of sending advertising faxes to persons who had *consented*."], emphasis in original.) Alco goes so far as to state that "[i]t is also undisputed that Alco explicitly instructed B2B/Macaw to limit the faxing ***only*** to persons who had consented to receive fax

advertisements." (*Id*. at 4120, all emphasis in original.) Defendant misrepresents the testimony in the record.

In his 2010 deposition, Gajdos testified Wilson told him that B2B "had a list of businesses that they would send the fax to" and that "they already had communications with, that they had the right to send them a fax. They already had a business relationship with them." (Gajdos Dep. I at 21-24.) He further testified that Wilson assured him that B2B "had their authorization to send a fax[,]" that B2B had "a full and open relationship with all of the faxes they were sending out[,]" and that its services were "100 percent legal[.]" (*Id*. at 25-26, 34.) In his 2016 deposition, Gajdos reiterated that he was told that B2B had a relationship with the intended fax recipients, and that he gave B2B the "right to send that fax out, the one I chose, to their list of clients that they . . . told me they could send it to." (Gajdos Dep. II at 11.)

From these exchanges, several observations can be made. First, they do not demonstrate, as defendant suggests, that Gajdos "explicitly instructed" B2B to only send faxes to people who consented. There is nothing in the record to suggest that Gajdos gave Wilson *any* limiting instructions regarding the intended recipients of the faxes. In cases relied upon by Alco where courts have found an advertiser blameless for faxes sent by B2B, the advertiser gave explicit, unequivocal instructions as to whom and where the faxes should be sent. *See, e.g., Sarris*, 212 F. Supp. 3d at 1293 (advertiser told B2B to limit the faxes to certain zip codes and to exclude dentists); *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 C 5601, 2014 WL 7717584, at *2 (N.D. Ill Nov. 21, 2014) (advertiser instructed that only 100 faxes to certain numbers in Terre Haute, Indiana would be sent but B2B sent thousands as far away as Cleveland, Ohio). Because the TCPA offending faxes would not have been sent but for the broadcaster's unilateral decision

to disregard the advertiser's clear instructions, the advertiser in these cases was not liable for the resulting violations.

Of course, Alco also insists that, had B2B kept its promise to only send faxes to people who had consented, the violations would not have occurred, and this brings the Court to its second observation—the record stops short of establishing, as a matter of law, that B2B promised that it would only send faxes to those who had given a "prior express invitation or permission" to send the fax. TCPA, 47 U.S.C. § 227(a)(5). Instead, Gajdos testified that he was told, at various times, that B2B had a full and open relationship with the recipients, that they had the right to send the faxes, and that it was "100 percent legal."

The question becomes whether Alco could reasonably rely on the representations B2B did make. *See Siding*, 822 F.3d at 900. The Court finds the analysis in *Cin-Q Auto* helpful and persuasive as to this inquiry. Faced with somewhat similar facts, the district court determined that questions of material fact precluded summary judgment on the question of "on-whose-behalf" the offending faxes were sent. There, the defendant employed the services of FaxQom to send faxes advertising the sale of defendant's sporting tickets. During the negotiations, FaxQom made several assurances to defendant: (1) it represented that the fax list contained 100% opt-in numbers; (2) it only used "legal techniques"; and (3) it would abide by all laws associated with facsimile marketing. It also promised to indemnify defendant. *Cin-Q Auto*, 2014 WL 7224943, at *8. After the first set of faxes was sent out, defendant received complaints from individuals asking to be taken off the list. Notwithstanding the complaints, defendant approved a second wave, which was met with additional complaints. The defendant even went so far as to approve a third wave of transmission.

The court found that some factors favored each side. Specifically, the court observed defendant had some control over the content, which displayed images and messages that were commercially advantageous to defendant, though it emphasized that defendant had no access to the list. In finding questions of fact precluding summary judgment, the court reasoned that the "privity of the parties involved in the broadcasts appears to be, as [defendant] argues, a tortured path of lies and deceit. A reasonable jury could conclude that [defendant] relied on reasonable assurances by FoxQom[.]" *Id*. (record citation omitted). However, the court also noted that "evidence in the record could also support the proposition that [defendant] ratified what it knew to be offending conduct—deciding to turn a blind eye and accept the collateral damage created by its agent's actions, all while hiding behind a promise of indemnity." *Id*. at *9 (footnote omitted).

Similarly here, a reasonable juror could find that Alco reasonably relied on promises of authorization based on established relationships and a guarantee of complete legality. However, a trier of fact could also find that Alco ratified B2B/Macaw's allegedly illegal conduct by not heeding (or even reading) the warnings of illegality in the complaint letters and blindly passing them on for someone else to deal with, all the while continuing to utilize B2B/Macaw's services without concern for the legality of the services it offered.

At the hearing on the motion, plaintiff's counsel argued that Alco should not be able to benefit from these assurances because the person to whom they were made—Gajdos—was unaware of the existence of the TCPA and its requirements. Plaintiff offers no support for the proposition that a layperson must be aware of and investigate the requirements of the TCPA in order to rely on promises that the broadcaster will comply with any and all relevant laws.

Instead, the Court finds that the representations that were made and Alco's overall awareness of its duties under the law should be considered, along with the totality of the circumstances, to decide liability. *See generally Sarris*, 212 F. Supp. 3d at 1299; *Cin-Q Auto*, 2014 WL 7224943, at *7.

Though the parties have engaged in additional discovery and briefing since the Sixth Circuit issued its order of remand, the facts surrounding the transmission of the faxes in 2015 and 2016 have not changed. It remains true that some of the relevant factors tend to favor a finding that the faxes were not sent "on behalf of" Alco, as Alco had no control over or access to the fax list and no right to approve the list prior to providing payment for the advertising. Alco also received assurances that the services it was purchasing would conform to the law, and it promptly sent the complaints it received to B2B/Macaw and received assurances that they would be addressed. Some facts, however, still favor a finding of liability, as Gajdos contributed to and approved the content of the advertisements which clearly promoted Alco's services,[8] and Gajdos admitted that he knew at the time that none of the entities on the list were customers of Alco.

More to the point with respect to the present dispositive motion, there are unresolved questions of fact associated with many of these factors, including whether measures taken by Alco to ensure compliance were sufficient given the fact that Gajdos never read the complaints and continued to employ the services of B2B after Alco was threatened with litigation. As previously mentioned, the reasonableness of Alco's reliance on B2B's assurances of legality and promises to only send to those who had consented to receive them also continues to be mired in factual disputes. Notwithstanding the promises made by B2B, Gajdos concedes that he was not

---

[8] In fact, Gajdos testified that he received customers from B2B/Macaw's fax blasting efforts. (Gajdos Dep. I at 29.)

aware of the requirements (or even existence) of the TCPA, yet he was well aware that B2B had sent unsolicited faxes in the past because that is precisely how he learned of the B2B's advertising services. These unresolved factual disputes preclude a finding that, as a matter of law, the advertisements were not sent on Alco's behalf and therefore, defendant's motion for summary judgment is denied.

### III. PLAINTIFF'S SECOND CLASS CERTIFICATION MOTION

#### A.     Standard of Review

A plaintiff seeking class certification must "affirmatively demonstrate" compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011). Plaintiff must "satisfy through evidentiary proof [each of the Rule 23(a) factors and] at least one of the provisions of Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S. Ct. 1426, 1432, 182 L. Ed. 2d 515 (2013). While class action certification does not go to the merits of the litigation, a trial court is permitted to examine the underlying merits of the claim as part of its rigorous analysis, but only to the extent necessary to determine whether the requirements of the rule is satisfied. *Dukes*, 564 U.S. at 350-51 (citations omitted). Moreover, Rule 23 grants "no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013) (citation omitted).

With respect to Rule 23(a), the plaintiff must show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the

16

class." Fed. R. Civ. P. 23(a). "The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349 (quotation marks and citations omitted) Plaintiff attempts to establish the appropriateness of certification under Rule 23(b)(3). Under this subsection, class certification will be appropriate where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig*., 722 F.3d 838, 850 (6th Cir. 2013).

This Court has "broad discretion" in deciding whether to certify a class within the framework of Rule 23. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996) (citations omitted). In making this determination, a district court may consider "what type of evidence will be presented by the parties." *Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 785 (6th Cir. 2005) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

## B.   Discussion

At the outset, the Court observes that it is not venturing into uncharted waters as the Sixth Circuit has recently issued several decisions addressing the certification of classes of litigants who have received alleged unsolicited faxes originating from B2B/Macaw. *See Bridging Communities Inc. v. Top Flight Fin. Inc*., 843 F.3d 119 (6th Cir. 2016) (reversing denial of class certification); *Imhoff Inv., L.L.C. v. Alfoccino, Inc*., 792 F.3d 627 (6th Cir. 2015) (reversing summary judgment awarded to defendant and sending back for a class certification

determination); *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.,* 757 F.3d 540 (6th Cir. 2014) (affirming grant of summary judgment awarded to a certified class). A fourth decision involving the same InfoUSA list, though not implicating B2B or Macaw, also guides the Court's analysis. *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460 (6th Cir. 2017) (affirming denial of class certification).

> Plaintiff proposes certification of the following class:
>
> All persons who were successfully sent one or more faxes on November 2, 2005 or July 10, 2006, from Alco Vending offering a "full line" of vending machines and stating "Absolutely no charge to you to have us put in your vending machines."

(Mot. Class at 3181.)

Defendant does not seriously challenge three of the Rule 23(a) requirements—numerosity, commonality, and typicality. Nonetheless, because it must employ a "rigorous analysis" of all factors, the Court will address each factor, touching only briefly on the ones for which there is little disagreement between the parties. *See Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012) (quotation marks and citation omitted).

### 1.    *Numerosity*

Beginning with numerosity, Rule 23(a)(1) requires the proposed class to be so numerous that joinder of all members would be impracticable. "Generally, the numerosity requirement is fulfilled when the number of class members exceeds forty." *Phillips v. Phillip Morris Cos. Inc.*, 298 F.R.D. 355, 362 (N.D. Ohio 2014) (citing *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)). Here, the record evidence establishes that defendant's advertisement was sent by fax 7,055 times to 4,547 persons. (Biggerstaff Ex. Rpt. ¶ 21 and Ex. 3-6.) Courts have consistently found classes similar in size to the one proposed by plaintiff to be sufficiently numerous to make

joinder impracticable. *See Daffin v. Ford Motor Co*., 458 F.3d 549, 552 (6th Cir. 2006) (recognizing that "substantial numbers usually satisfy the numerosity requirement") (internal quotation marks omitted); *see, e.g., Whirlpool*, 722 F.3d at 852 (putative class numbering in the "thousands" sufficient) (citation omitted).

### 2. *Commonality*

It is well settled that "there need only be one question common to the class[,]" so long as the resolution of that question "will advance the litigation." *Sprague v. Gen. Motors Corp*., 133 F.3d 388, 397 (6th Cir. 1998) (en banc) (citation omitted). Additionally, "'[c]lass relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class.'" *Card v. City of Cleveland*, 270 F.R.D. 280, 293 (N.D. Ohio 2010) (quoting *Falcon*, *supra*.).

Class members must have either a question of law or fact in common—not necessarily both. Fed. R. Civ. P. 23(a)(2). This test requires only some common questions; not a predominance of common questions as required under Rule 23(b)(3). It is "qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re Am. Med. Sys., Inc*., 75 F.3d 1069, 1080 (6th Cir. 1996) (quoting 1 NEWBERG ON CLASS ACTIONS, section 3:10 at 3-50 (3d ed. 1992)). Under this standard, even "one question common to the class" can satisfy the commonality requirement under Rule 23(a). *Sprague*, 133 F.3d at 397.

As plaintiff notes, this case involves standardized conduct relating to the transmission of the same fax(es) across the entire class. As such, there are common fact questions relating to defendant's fax campaign and common legal questions relative to the legality of the faxing

activity under the TCPA, such as: whether the fax is an "advertisement"; whether defendant violated the TCPA by authorizing the fax without first obtaining express written permission; whether defendant reasonably relied on the representations and assurances made by B2B; whether defendant's actions were "willful" or "knowing" under the TCPA and, if so, whether the Court should award treble statutory damages; and whether injunctive relief is appropriate. These common issues satisfy the Rule 23(a) commonality requirement.

### 3. Typicality

"A claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Beattie v. CenturyTel Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1082). Here, typicality is inherent in the class definition. Each class member was subjected to the same conduct; namely, the targeting of a fax advertising campaign. Each received the same fax, and each member's claim is based on the same legal theory as plaintiff's. Accordingly, Rule 23(a)(3)'s typicality requirement is satisfied.

### 4. Adequacy of Representation

Defendant focuses its first of two arguments on the fourth requirement—adequacy of representation. "Adequate representation is essential to a class action because without it there can be no preclusive effect of the judgment." *Elkins v. Am. Showa, Inc.*, 219 F.R.D. 414, 419 (S.D. Ohio 2002) (citation omitted). To assess the adequacy of the representation, the Court must consider whether the class representative will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). There are two prongs to this inquiry: "1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the

representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976) (citation omitted).

Relying on the arguments it raised in its summary judgment motion, defendant argues that plaintiff is not an adequate class representative because it does not have a valid claim under the TCPA. However, because there are questions of fact on that score, this argument cannot carry the day. *See Thomas*, 319 F.R.D. at 524 (rejecting similar argument as a means to defeat certification, noting that "'district courts may not turn the class certification proceedings into a dress rehearsal for the trial on the merits'") (quoting *In re Whirlpool*, 722 F.3d at 851) (further quotation marks and citation omitted).

The Court has no reason to otherwise question the adequacy of the class representative at this juncture. Plaintiff falls within the class it hopes to represent, and there is every indication that its principals and agents are willing and able to vigorously represent the interests of the class. Additionally, the Court finds that class counsel is adequate. Current class counsel is clearly qualified to litigate a class action of this nature, and this same counsel has already been certified adequate in numerous other class actions cases involving the same fax broadcasters. Moreover, they have been litigating TCPA claims since 2003 and have negotiated class-wide settlements in many such cases. (*See* Doc. No. 113-12 (Firm/Attorney Resumes for Bock, Hatch, Lewis, & Oppenheim, LLC); Doc. No. 113-13 (Firm/Attorney Resumes for Anderson + Wanca); Doc. No. 113-14 (Firm/Attorney Resumes for Climaco, Wilcox, Peca, Tarantino & Garofoli Co., L.P.A.).) This factor is also satisfied.

Defendant's second argument is that class certification should be denied "because of a predominance of individualized evidence." (Mot. Class Opp'n at 3914.) It claims that "[i]ndividual issues regarding the timeliness of claims by class members with whom [d]efendant has an established business relationship (EBR) cannot be decided on a class-wide basis." (*Id.*) According to defendant, "undisputed facts confirm that a number of the putative class members were excluded from the class alleged in the earlier-filed action that [p]laintiff relies on for tolling. Specifically, the class definitions alleged in the prior action expressly excluded persons with whom [d]efendant had an established business relationship. As a result, their claims were never tolled and are now time-barred." (*Id.*) Relying on records disclosed during discovery, defendant has identified at least 42 potential class members with whom Alco has a pre-existing business relationship. (*See id.* (chart) at 3916-17.)

Defendant's argument implicates Rule 23(b)(3). The predominance requirement is far more exacting than the Rule 23(a) analysis, and requires a showing that common issues predominate over individual ones. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997) ("predominance criterion is far more demanding") (citation omitted). "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. at 459 (emphasis in original). Common questions are those "that can be proved through evidence common to the class." *In re Whirlpool Corp.*, 722 F.3d at 858 (citation omitted). "That said, plaintiffs seeking class certification 'need not prove that each element of a

claim can be established by classwide proof: "What the rule does require is that common questions *predominate* over any questions affecting only individual [class] members.'"" *Bridging Communities*, 843 F.3d at 1124 (quoting *In re Whirlpool Corp.*, 722 F.3d at 858, quoting *Amgen*, 133 S. Ct. at 1196) (emphasis in original).

The federal four-year "catch-all" statute of limitations in 28 U.S.C. § 1658(a) applies to claims under the TCPA. *Giovanniello v. ALM Media, LLC*, 726 F.3d 106, 115 (2d Cir. 2013). The present action was filed on May 24, 2011, more than four years after the subject faxes were sent, and, accordingly, the claims of the members of the putative class would be time-barred unless tolling was available. Plaintiff maintains that a previously filed state action supplies the necessary tolling and renders the putative class's claims timely. *See Phipps v. Wal-Mart Stores, Inc*. 792 F.3d 637, 643 (6th Cir. 2015) ("The timely filing of a class-action complaint commences suit and tolls the statute of limitations for all members of the putative class who would have been parties had the suit been permitted to continue as a class action.") (citing *Am. Pipe & Constr. Co v. Utah*, 415 U.S. 538, 550, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354, 103 S. Ct. 2392, 76 L. Ed. 2d 628 (1983)).

On June 15, 2009, Alco was named a defendant in a TCPA action filed in state court. (Doc. No. 118-5 (*Appliance & Furniture Rental Ohio, Inc. v. Alco Vending, Inc.*, CV 09 695796 (Cuy. Cnty. Ct. C.P., Class Action Complaint)) ¶ 13.) The first complaint defined the class as:

> All persons in Ohio who were (1) on or after four years before the filing of this action, (2) faxed advertisements concerning the commercial availability of any property, goods, or services by or on behalf of [d]efendant, (3) with respect to whom [d]efendant did not have prior express permission or invitation to send these faxes and (4) *with whom [d]efendant did not have an established business relationship.*

(*Id*., emphasis added). While the state complaint was amended several times, each iteration contained the limitation that class members could not have an "established business relationship" with Alco. (P. Suppl. at 5026 & n.1, record citations omitted.) The state court case was voluntarily dismissed on May 24, 2011, and the current action was filed on the same day. (*Id.*, record citations omitted.) The proposed class in this case contains no such limitation.

Plaintiff concedes that "[t]o be a member of the state court class entitled to *American Pipe* tolling . . . one had to be a person 'with whom [d]efendant did not have an established business relationship.'" (*Id*. at 5027, quoting state court complaint). Plaintiff further "agrees that the Court should exclude [the 42 customers identified by Alco in its opposition brief] from the class because they were not included in the class definition used in the prior state court class action against [d]efendant, and the statute of limitations has arguably run against their claims." (*Id*. at 5025.) However, plaintiff insists that the existence of these outliers in the class definition does not defeat certification.

In support, plaintiff relies heavily upon the Sixth Circuit's decision in *Bridging Communities*. There, the district court denied the plaintiff class certification upon its finding that "determining if class members had [] consented [to receipt of the fax ads] 'would require investigation of the factual circumstances of each person or business that received a facsimile transmission[.]'" *Bridging Communities*, 843 F.3d at 1123 (quoting district court opinion). The Sixth Circuit reversed, and in doing so explained:

> We have recognized repeatedly that "the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." *Young* [*v. Nationwide Mut. Ins. Co.*], 693 F.3d [532,] 544 [(6th Cir. 2012)] (quoting *Beattie*, 511 F.3d at 564). Here, Bridging Communities and Gamble presented evidence suggesting a class-wide absence of consent—evidence that B2B failed to contact anyone on the list it

purchased from InfoUSA to verify consent prior to faxing them advertisements. In response, Top Flite merely alleged that class members *might* have given consent in some other way. The district court adopted this idea, opining that B2B's failure to obtain consent "does not foreclose the possibility that some of those [class] members gave consent to [Top Flite] and or InfoUSA[,]" even though Top Flite did not offer any information or evidence to support that theory. (R. 65, PageID 1356.)

We are unwilling to allow such "speculation and surmise to tip the decisional scales in a class certification ruling[,]" *West Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000), particularly under the circumstances present here. Our precedent is clear that a possible defense, standing alone, does not automatically defeat predominance. *See Young*, 693 F.3d at 544; *Beattie*, 511 F.3d at 564; *see also In re HCA Holdings, Inc*., No. 14-0511, 2015 WL 10575861, at *2 (6th Cir. Feb. 26, 2015).

*Id*. at 1125-26 (emphasis in original).

The court in *Bridging Communities* went on to observe that even if the defendant would have been able to "point to some evidence that a defense will indeed apply to some class members, which is more than Top Flite did here, courts routinely grant certification because 'Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class.'" *Id*. at 1126 (quoting *Smilow v. Sw. Bell Mobile Sys., Inc*., 323 F.3d 32, 39 (1st Cir. 2003) (further citation omitted)). The court noted that, had the defendant come forward with some evidence that certain class members had given consent to receive the fax transmissions, the district court could "place class members with potentially barred claims in a separate subclass, or exclude them from the class altogether." *Id*. (quotation marks and citation omitted).

Plaintiff argues that this Court should, as the court in *Bridging Communities* suggested, carve out those 42 entities defendant identified (with supporting documentation) as having an existing business relationship, but that it should not find the possible existence of other such entities based solely on defendant's speculation. Alco retorts that it is not relying on speculation,

but has come forward with "documents and testimony identifying class members with whom it has an established business relationship and describing circumstances which warrant investigation into whether the remainder of the alleged class has similar relationships." (D. Suppl. at 5040.) In addition to the 42 customers identified in the opposition brief, defendant attached to its supplemental brief the affidavit of Richard Gajdos wherein Gajdos avers that he recently reviewed the list of fax recipients produced in discovery and has identified additional entities he "recognize[s] as having been an Alco Vending customer[,]" and has attached a list containing 73 additional business names (Doc. No. 130-1 ["Gajdos Aff."] ¶¶ 5-8 & Ex. A.) Gajdos further avers that "[i]n 2005 and 2006, Alco had many other customers and contacts that were located in the same geographic region as the businesses" on the list, but that, "[g]iven the passage of time, [he is] not able to recall each customer by name." (*Id.* ¶¶ 9-10.) According to Alco, this "concrete evidence," along with the Sixth Circuit's recent decision in *Sandusky Wellness Ctr.*, compels a finding that the proposed class violates Rule 23(b)(3). (D. Suppl. Resp. at 5047.)

In *Sandusky Wellness Ctr.*, a decision issued during the period of supplemental briefing in this case, the Sixth Circuit determined that the district court did not abuse its discretion in denying certification of a class of fax recipients on the basis that individualized questions of consent prevent common questions from predominating under Rule 23(b)(3). There, the defendant sent a fax to over 53,000 local physicians on the InfoUSA list, without realizing that the list contained former or current customers. Because it was determined that the defendant's customers could not claim a violation of the TCPA and would need to be weeded out by means of a manual review, the district court denied class certification on predominance grounds. *See*

*Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc*., No. 3:13 CV 2085, 2016 WL 75535 (N.D. Ohio Jan. 7, 2016).

In affirming the district court's decision, the Sixth Circuit emphasized that the review process to filter out the ineligible class members would necessitate a "form-by-form inquiry," requiring the trial court to review countless documents. *Sandusky Wellness Ctr*., 863 F.3d at 469. The court also distinguished its prior decision in *Bridging Communities*, noting that there, "the defendant had simply 'raised the possibility' that 'individual class members *might* have solicited or consented to receiving the challenged faxes[,]' . . . [whereas,] by contrast, [defendant] ha[d] produced concrete evidence of consent, evinced by hundreds of thousands of customer documents, some of which we know for certain match the names of individuals on the [recipient fax list]" placing the determination of class membership at the forefront of the litigation. *Id*. The court explained:

> Reviewing these documents, discerning which provide the requisite consent, and then manually cross-checking each individual customer name against the [list]—with a match indicating [defendant] has a valid defense as to that individual—is no hypothetical scenario. Were the class certified, this undertaking would be a tangible reality for the district court, sufficiently distinguishing the facts of this case from the mere "speculation and surmise" that existed in *Bridging Communities*.

*Id*.

Relying on the 42 customers it identified in its opposition brief, and the additional names identified by Gajdos in his affidavit, Alco maintains that it has come forward with similar "concrete evidence" to establish that the process of culling its present and former customers from the faxing list would be too burdensome to permit certification. (D. Suppl. Res. at 5049.) It insists that "[r]egardless of other questions that may be common to the class, identifying such

individuals through investigation of each persons' relationship with Alco 'would undoubtedly be the driver of the litigation.'" (*Id.*, quoting *Sandusky Wellness Ctr.*, 2017 WL 2953039, at *6 [863 F.3d at 468].)

Plaintiff objects to Alco's attempt to rely on Gajdos' affidavit and the additional names referenced therein, arguing that this information was not disclosed during discovery. It cites a 2010 interrogatory requesting the names of any and all entities on the list with which Alco contended it had an existing business relationship. (P. Suppl. Res. at 5052.) Plaintiff highlights Alco's answer "Unknown[,]" as well as the fact that Alco never supplemented its answer. Siding also cites Gajdos's 2010 deposition testimony wherein he testified that he could not remember if the named plaintiff in the state court action was a customer, and his 2016 testimony where he answered "no" to the question "As far as you know, Alco didn't have permission from the target population or an established business relationship with the target population, correct?" (*Id.*, record citations omitted.) Siding complains that Alco had a duty to supplement its discovery responses under Rule 26(e), rendering the 2017 affidavit untimely. (*Id.*) It is plaintiff's position "discovery is closed[,]" that the Court should exclude the original 42 names, plus the newly identified names, and that "the remainder of the recipients form the class." (*Id.* at 5053.)

Plaintiff's argument misses the mark on two fronts. First, it is plaintiff that bears the duty of demonstrating the appropriateness of class certification, it is not defendant's duty to come forward with evidence demonstrating the opposite. *See Comcast Corp.*, 133 S. Ct. at 1432 (Plaintiff must "satisfy through evidentiary proof [each of the Rule 23(a) factors and] at least one of the provisions of Rule 23(b)."). While defendant must do more than simply raise the possibility of an affirmative defense, *see Bridging Communities, supra*, it is plaintiff that must

ultimately convince the Court that the requirements of Rule 23 have been met. Second, the purpose of the Rule 23 discovery period was to assist the parties in briefing plaintiff's renewed motion for class certification, it was not to identify with certainty the members of the proposed class. As in the present case, the parties in *Sandusky Wellness Ctr.* engaged in "extensive discovery" before briefing the plaintiff's class certification motion. 2016 WL 75535, at *1. The district court denied certification, not because defendant had proven which potential class members were decidedly ineligible to share in any possible recovery, but because the process of identifying the eligible class members—something that would take place at a later time—would predominate the case.

Defendant has done more than simply raise a possible defense to class certification. It has come forward with concrete evidence that the claims of certain class members may be time-barred. Additionally, unlike the situation in *Bridging Communities*, the determination of whether the asserted defense applies cannot be accomplished through the use of class-wide proof. As was the case in *Sandusky Wellness Ctr.*, the eligibility determination would need to be made on an entity-by-entity basis, and accomplished by means of reviewing defendant's records to see if defendant had an existing business relationship with each entity during the relevant time period. While the universe of class members here numbers in the thousands, instead of the tens thousands facing the district court in *Sandusky Wellness Ctr.*, the analysis would still be daunting as it would require individualized investigations into the extent and nature of Alco's relationship with each entity on the fax list. "Certification is thus inappropriate because [plaintiff] has 'failed to advance a viable theory of generalized proof to identify those persons, if any, to whom [defendant] may be liable under the TCPA.'" *Sandusky Wellness Ctr.*, 2016 WL 75535, at *4

(quoting *Gene & Gene LLC v. BioPay*, 541 F.3d 318, 327-29 (5th Cir. 2008) (denying class certification where issue of consent could not be established via class-wide proof) (further citation omitted)); *see G.M. Sign, Inc. v. Brink's Mfg. Co*., No. 09 C 5528, 2011 WL 248511, at *8 (N.D. Ill. Jan. 25, 2011) (individualized issues predominated where defendant submitted evidence of consent that required "a class-member-specific inquiry to determine whether each recipient did indeed give permission or have an established business relationship with [d]efendant at the pertinent time"); *Jamison v. First Credit Servs., Inc*., 290 F.R.D. 92, 107 (N.D. Ill. 2013) (individual issues predominated due to evidence that potential class members had consented that required "a series of mini-trials to determine the population of the class and to determine liability[]"); *see also Warnick v. Dish Network LLC*, 301 F.R.D. 551, 556 (D. Colo. 2014) ("If the court must undertake individualized inquires in order to determine whether a person is a member of the class, the class is not appropriate.") (citation omitted).

Moreover, the Court need not rely on Gajdos's 2017 affidavit (or the names of potential customers identified therein) to reach this conclusion. The record established that Alco had been doing business at the same location located within the same geographic area targeted by the fax campaign. (Gajdos I Dep. at 7-9; Gajdos II Dep. at 8.) While he did not know the exact number of customers Alco had in 2008, Gajdos estimated that the number was in the "hundreds[.]" (Gajdos I Dep. at 33.) Caroline Abraham testified that B2B and Macaw sent the subject faxes to "the closest businesses" they had to defendant's zip code. (Abraham Dep. at 47.) No effort was made to exclude existing customers from the faxing list, and Alco did not provide B2B or Macaw with a list of people that should (or should not) receive the fax. (*Id*. at 104.) In fact, Abraham testified that it was "very likely" that some of the faxes went to customers that already

had a relationship with Alco. (*Id*. at 47; *see id*. at 48 ["if Alco Vending was doing business in its local area and we send faxes in that area there is very likely an overlap [between all fax recipients and those who were also then-current Alco customers"]; 102-03 [Q. "And we don't have any idea the number of entities to whom faxes were sent that already had such an existing business relationship [with Alco]?" A. "I have no idea."]; 103 ["only Alco Vending or the customers themselves can tell us if they were already connected with Alco Vending"].)

It is not surprising, therefore, that Alco was able to produce documentation demonstrating that it had an existing business relationship with at least 42 of the entities on the fax list. (*See* Doc. No. 118-4.) Defendant has never represented that this was a complete list, and, as early as 2013, has indicated that the 42 names came from an "initial review" of Alco business records.[9] (Doc. No. 45 (Alco's opposition to Siding's initial motion for class certification) at 1913), filed Oct. 28, 2013). Accordingly, it is reasonable to conclude that a more complete review of Alco's records would be necessary to determine whether the claims of other entities on the faxing list would be similarly time-barred, and, coupled with the individualized inquiry as to timeliness of each potential class member's claim that would follow, would predominate the case.[10]

---

[9] It does not appear that Gajdos was asked anything about this list, and his review of company records that lead to the creation of the list, in his 2016 deposition.

[10] The Court is mindful of plaintiff's allegations of discovery abuse. However, plaintiff has not moved for discovery sanctions, and, further, it is unclear whether any such motion would be successful. Moreover, there is nothing in the record that would demonstrate that defendant acted in bad faith, such that the Court would consider exercising its inherent power to sanction. *See Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011) (court has the inherent power to impose sanctions when a party has litigated "in bad faith, vexatiously, wantonly, or for oppressive reasons," or when the conduct was "tantamount to bad faith") (quotation marks and citation omitted). In any event, the Court does not rely on the evidence plaintiff now complains should be excluded.

## IV. CONCLUSION

For all of the reasons set forth above, the Court finds that defendant has failed to establish that it is entitled to judgment as a matter of law and that plaintiff has failed to satisfy its burden of establishing that this case is suitable for treatment as a class action. Therefore, both motions are denied.

**IT IS SO ORDERED**.

Dated: August 25, 2017

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**